UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROBERT GOMILLIA-LEVY,          )
                               )
          Plaintiff,           )
                               )
     vs.                       )          Case No. 4:04CV00942  AGF
                               )
JO ANNE B. BARNHART,           )
Commissioner of Social Security,)
                               )
          Defendant.           )


**<u>MEMORANDUM AND ORDER</u>**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying plaintiff Robert Gomillia-Levy's application

for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401,

et seq., and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C.

§ 1381, et seq.[1]  For the reasons set forth below, the case shall be remanded for further

consideration of whether Plaintiff's impairments meet Listing 1.02 of the Commissioner's

Listing of Impairments.

Plaintiff, who was born on March 7, 1972, previously filed an application for SSI

on December 8, 1993, and was awarded benefits on March 3, 1994, based upon obesity

and arthritis.  He returned to work in August 1996 and worked intermittently through

August 2000.  Tr. at 78-79, 101.  Plaintiff filed the present applications for SSI and

---

[1]     The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

disability insurance benefits on December 8 and 11, 2000, respectively, based on lower back pain, right knee pain, and obesity. Plaintiff's applications were initially denied, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on February 7, 2003, at which Plaintiff and a vocational expert testified. At the hearing, Plaintiff amended his claim to allege a disability onset date of December 8, 2000. Tr. 3. On August 29, 2003, the ALJ issued a decision that, although Plaintiff suffered from severe impairments, he was not disabled as defined by the Act. The Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ committed reversible error by (1) not sufficiently addressing the issue of whether or not Plaintiff was disabled because his condition met an impairment listed in the Commissioner's Listing of Impairments, 20 C.F.R. § 404, Subpt. P, App. 1 ("Appendix 1"); (2) not considering submitted medical evidence related to Plaintiff's obesity; and (3) making an unfair and inappropriate credibility assessment of Plaintiff's subjective complaints.

## BACKGROUND

### Work Record

Plaintiff's testimony and earnings records indicate the following employment history. Plaintiff graduated from high school in 1991. After high school, he worked as a wheelchair assembler for three to four months, but was not kept on because he was sitting

down too much.  He then worked as a dishwasher at a restaurant for about a month, but
was not able to perform the work because it required too much standing.  At that point, in
1993, Plaintiff applied for SSI, which was awarded without a hearing on March 3, 1994.
In 1996, Plaintiff went back to work as a yardman for a towing company, walking or
driving around the lot to find cars, for three or four months.  Plaintiff next worked as a
tow truck driver for less than a year.  Beginning in 1997, Plaintiff worked as a delivery
driver for less than six months.  He left that job because his knee was causing him too
much pain to work.  Plaintiff then worked as a car washer and detailer for three months,
until his employer went out of business.  He was able to perform that work because his
boss permitted him to take frequent breaks, eight to ten a day.  After that, for a period of
two weeks, Plaintiff worked in an auto parts warehouse, but left because he was not able
to sit down.  Plaintiff also worked at an auto body shop doing manual labor for "less than
a year."  Plaintiff returned to his job as a tow truck driver for a period in 2000, and finally
worked as an ice deliveryman for about four months, quitting in August 2000 because of
his physical condition.  During the years that he worked, Plaintiff earned between $377
(in 1999) and $13,111 (in 1997) a year.  Tr. at 77-79, 205-220.

**<u>Medical Record</u>**

Plaintiff was born with genu varum in his right knee (a bowed leg).  He had
arthroscopic surgery on this knee in 1991.  Tr. at 180.

On March 6, 2001, Plaintiff presented at an emergency department complaining of
lower back and right knee pain related to an injury suffered as a result of an altercation

involving wrestling. At this time Plaintiff was living in Nevada. He was diagnosed with a lumbar sprain. Tr. at 141-42. On March 16, 2001, Plaintiff visited Anthony B. Serfustini, M.D., at an orthopedic clinic, complaining of continued right knee pain and discomfort over the previous nine years, and was diagnosed with early degenerative changes to the right knee, but no gross instability. Range of motion of the right knee was limited to 130 degrees (of a normal range of 150 degrees). X-rays revealed medial and lateral joint space narrowing. Plaintiff was prescribed Vioxx,[2] physical therapy, and activity modification, and was given a work restriction of no prolonged walking, standing, or climbing. He was deemed to be able to return to work on April 27, 2001. Tr. at 134-38.

On April 27, 2001, Plaintiff was seen by Madhu Rao, D.O., at the same orthopedic clinic, complaining of right knee pain combined with grinding and swelling after prolonged usage, and numbness of both feet after prolonged standing. Plaintiff reported that he had had these problems for a long time. Dr. Rao diagnosed him with degenerative joint disease of the right knee, bilateral pes planus (flatfeet) with posterior tibial tendon

---

[2]    Vioxx (rofecoxib) is a nonsteroidal anti-inflammatory drug used to reduce pain and inflamation.  Physicians Desk Reference 2213 (56th ed. 2002) ("PDR").

insufficiency,[3] and bilateral tarsal tunnel syndrome.[4] An x-ray revealed arthritic changes to the right knee. Range of motion of this knee was limited to 130 degrees. Plaintiff was prescribed an Ace sleeve and orthotics and given a work restriction of no prolonged walking, standing, or climbing. Tr. at 130-33.

On June 15, 2001, Plaintiff, complaining of continued discomfort, returned to Dr. Serfustini, who diagnosed Plaintiff as morbidly obese and noted crepitation at his right knee, degenerative joint disease of the right knee, bilateral pes planus, and tarsal tunnel syndrome. Orthotics and Vioxx were prescribed and weight loss was recommended. Dr. Serfustini stated that Plaintiff was disabled from performing his previous job as a mechanic, and that he was not currently a candidate for invasive studies or injections.[5] Tr. at 128.

On October 19, 2001, Plaintiff returned to the same orthopedic clinic, where Wari L. Wabara, M.D., diagnosed Plaintiff with varus "knees," patellofemoral arthritis (arthritis below the kneecap), and morbid obesity. Dr. Wabara recommended weight loss

---

[3] Posterior tibial tendon insufficiency is a condition caused by injury or degeneration in which the posterior tibial tendon, which connects the shin bone to a bone in the arch of the foot, can no longer support the arch of the foot, which leads to flatfoot. http://www.arthroscopy.com.

[4] Tarsal tunnel syndrome results from irritation caused by pressure on the sensory nerve that passes through the tarsal tunnel in the ankle and can cause numbness and tingling in the foot and toes. It is analogous to carpal tunnel syndrome in the hand and wrist. http://www.medicinenet.com.

[5] The progress note uses the word evasive, which the Court assumes is a transcription error.

and placed Plaintiff on Naprosyn[6] and Tylenol #4,[7] and recommended that Plaintiff refrain from working for three months.  Tr. at 139, 155.

On January 22, 2002, Plaintiff presented to Dr. Serfustini with continued discomfort and was diagnosed with moderately advanced tricompartmental disease (arthritis affecting all three compartments of the knee) in his right knee.  Range of motion was limited to 123 degrees, and the doctor noted pain with extension and flexion.  Dr. Serfustini recommended that Plaintiff continue treating his condition with anti-inflammatory medications and an occasional pain pill, and said that Plaintiff was unable to perform any type of construction work.  Tr. at 154.

On March 1, 2002, Plaintiff, complaining of right knee pain, returned to the same clinic and was seen by Roman Schwartsman, M.D., who diagnosed moderate to severe tricompartmental degenerative joint disease in the right knee.  Despite Plaintiff's request, Dr. Schwartsman refused to declare Plaintiff totally disabled, "in light of the fact that the rest of him is unimpaired."  Dr. Schwartsman's note stated that Plaintiff was going to see Dr. Serfustini to obtain total disability.  Tr. at 153.

In progress notes dated April 2, 2002, Dr. Serfustini wrote that Plaintiff's recent x-rays showed moderate to severe tricompartmental osteoarthritic disease in his right knee. Physical examination revealed "painful arc of motion from -10 to 105 degrees."  The

---

[6]     Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drug prescribed for the treatment of arthritis, among other conditions.  PDR 2267.

[7]     Tylenol 4 contains 300mg of acetaminophen and 60mg of codeine, a narcotic, and is prescribed for pain.  PDR 2595.

doctor recommended maintaining Plaintiff on conservation measures because he was too young for a total knee replacement and needed to lose weight. Dr. Serfustini prescribed Vioxx and a light exercise program and declared Plaintiff permanently disabled from construction. Tr. at 152.

On December 4, 2002, after returning to St. Louis, Plaintiff was treated at St. Louis ConnectCare Clinic, complaining of right knee and lower back pain. The records reveal that on that date his weight was 328 pounds. X-rays of Plaintiff's right knee and lower back on December 26, 2002, were within normal limits. By February 5, 2003, Plaintiff's weight had risen to 350 pounds. Tr. at 162, 169-71.

**Evidentiary Hearing**

At the evidentiary hearing held on February 7, 2003, Plaintiff, who was represented by counsel, and a vocational expert testified. Plaintiff testified that he was separated from his wife, but that he watched his four-year-old daughter, who lived with his wife, during the day while his wife was at work. Plaintiff said that he currently lived with a friend and his friend's grandchildren. Tr. at 202-04.

Plaintiff then described his work history. He testified that during the period he was working, he did not seek medical care because he had no insurance, but he self-medicated with ibuprofen on a daily basis. Plaintiff testified that bending, lifting, and standing caused pain in his lower back and his right knee, which "pops and jumps out of place." Plaintiff stood so that the ALJ could observe his knee, and the ALJ noted bowing of the right knee, so that it was "out of alignment by maybe three or four inches laterally." Tr. at 220-33. A knee brace was prescribed, but Plaintiff testified he never got

it because it was not covered by medical coverage.  Tr. 241.

Plaintiff testified that he could only stand without any problems for four to five minutes.  He stated that lifting 20 pounds hurt his lower back and knee, and that carrying things caused extreme pain to his knee.  When asked by counsel if he had problems walking, Plaintiff responded as follows:  "I walk a quarter of a block if I walk – I'm stopping two or three times."  He stated that this was the case even when he used his walking stick or a cane, and without one he needed to stop even more.  Tr. at 234-35.

Plaintiff testified that he could not drive for long periods of time, and that he was uncomfortable whenever he drove.  He stated that prolonged sitting caused pain, and that he usually sat with a heating pad on his back.  He also said that he needed to elevate his leg to be comfortable.  Plaintiff testified that his biggest problem was climbing steps.  Tr. at 235-36.

Plaintiff testified that he was six feet tall and weighed 350 pounds.  He acknowledged that weight was a large part of his problem, and that he had weighed as little as 315 pounds in the last few years but could not tell any difference in his pain when he was at that weight.  He stated that he was not able to engage in a program of exercise other than aquatic exercise because of his knee.  Plaintiff testified that he was currently taking prescription-strength ibuprofen for pain, which made him tired and caused him to sleep extensively.  He further stated that he had to lie down once or twice during the day for 30 to 40 minutes because of his condition.  He testified that there were days when he did not leave the house, though he sometimes went to the grocery store.  Plaintiff testified that he did his own laundry, but did not do any cleaning.  Tr. at 236-44.

Plaintiff testified that he was no longer able to perform any of the jobs that he had in the past. He characterized his pain as "way worse" than it had been when he was working, and stated that his condition continued to get worse. He testified that he would not be able to perform a job that just required sitting, because he needed to lie down occasionally due to his lower back pain and elevate his leg due to his knee problem. After 63 minutes of testimony, the ALJ noted that Plaintiff was sitting leaning back in his chair with his legs extended; Plaintiff stated this was necessary for him to be comfortable. Tr. at 246-51.

The vocational expert testified that Plaintiff's only transferrable skill from his previous jobs was knowledge of how to operate commercial trucks. The ALJ asked the vocational expert what jobs someone with Plaintiff's vocational factors (age, education, and work experience) could perform that would be sedentary; would not require operation of repetitive right leg controls, kneeling, crawling, climbing, exposure to cold temperature extremes or significant stooping or crouching; would permit the worker to change positions to be able to briefly stand; and would permit the worker to walk with a cane. The vocational expert responded that the jobs of cashier, food and beverage order clerk, and telephone solicitor, all at the unskilled sedentary level, fit that description. He stated that 1,400 to 2,500 of each of these positions were available in the St. Louis area. The vocational expert testified that if the worker needed to elevate a leg to waist-high or a level that required reclining, he would not be able to perform these jobs. He also testified that none of the jobs he had identified would permit the worker to take breaks during the

day to lie down (without specifying the number of breaks or the duration of each).  Tr. at 253-60.

At the conclusion of the hearing, Plaintiff's attorney argued that Plaintiff satisfied Listing 1.02 of Appendix 1, for major dysfunction of a joint.  Counsel pointed to the medical reports and Plaintiff's testimony regarding his symptoms.  He also argued that, in the alternative, Plaintiff's RFC did not permit him to engage in substantial gainful employment.  Tr. at 265.

**Post-Hearing Medical Evidence**

Subsequent to the administrative hearing, Plaintiff was examined by consulting physician Jack C. Tippett, M.D., on May 19, 2003, as directed by the ALJ.  On that date, Plaintiff weighed 393 pounds, and Dr. Tippett diagnosed Plaintiff as morbidly obese.  He found that Plaintiff walked with a limp on his right side, but did not require external assistance in walking.  He also found that Plaintiff was not able to assume a full squatting position.  Dr. Tippett observed a slight pelvic tilt to the right when Plaintiff stood barefoot on both feet, and tenderness in Plaintiff's lower back.  Examination of the right knee showed moderate lateral bowing and slight internal right tibial torsion (foot pointed inward).  Plaintiff's right knee could be fully extended, but only flexed to 90 degrees; he could bend his left knee to 140 degrees.  Dr. Tippett characterized Plaintiff's right knee as stable, non-tender, and non-swollen.  He diagnosed Plaintiff as suffering from (1) right knee pain with degenerative joint disease and moderate genu varum, (2) obesity, and (3) chronic low back pain.  Tr. at 180-82.  X-rays of Plaintiff's right knee on that date revealed advanced degenerative and hypertrophic changes and moderate genu varum.  Tr.

at 183.  Dr. Tippett recommended that Plaintiff not walk or stand more than two hours in an eight-hour workday.  Tr. at 186.

## ALJ's Decision of August 29, 2003

The ALJ found that Plaintiff had not worked since the December 8, 2000 alleged onset of disability, was unable to perform any of his past relevant work, and had no transferable skills from that work.  The ALJ found that Plaintiff suffered from the severe impairments or combination of impairments of degenerative joint disease of the right knee, genu varum, and obesity.[8]  The ALJ then summarily determined that these impairments did not meet or medically equal an impairment listed in Appendix 1.  Tr. at 22.

The ALJ disbelieved Plaintiff's assertion that his impairments were so severe as to prevent all sustained work activity.  The ALJ noted that Plaintiff baby-sat his four-year-old daughter during the day, drove an automobile, and did his own laundry.  The ALJ found Plaintiff's allegations of disabling symptoms to be contradicted by the medical records, asserting that no physician, during the alleged period of disability, ever placed any specific long-term work-related restrictions on Plaintiff's activities more limiting than found in the ALJ's residual functional capacity ("RFC") determination, set forth below, or opined that Plaintiff was unable to work.  The ALJ stated that significant clinical signs

---

[8]     The Court notes that obesity was deleted from the Commissioner's Listing of Impairments, effective October 25, 1999.  64 Fed. Reg. 46122 (1999).  Obesity remains a factor to be considered by the ALJ in making a disability determination.  Social Security Ruling 00-3p (May 15, 2000) ("Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.").

typically associated with chronic pain were not "consistently present on physical examination." The ALJ further noted the lack of objective evidence in the record of muscle atrophy, severe and persistent muscle spasm, right knee instability, neurological deficits (i.e. reflex, motor, or sensory loss), or inflammatory signs (heat, redness, swelling, etc.). The ALJ found that there was no evidence in Plaintiff's medical records that he needed to elevate his knee, or that he required the use of a medically prescribed assistive device for walking, nor was there a specific medically determinable diagnosis regarding Plaintiff's back pain.

The ALJ stated that Plaintiff's need of "minimal or conservative treatment" was inconsistent with the allegation of a disabling impairment. The ALJ noted that Plaintiff was not a candidate for surgery or injections, and found that "the lack of strong prescription medication" and Plaintiff's use of ibuprofen was inconsistent with his complaints of disabling pain. The ALJ further noted that there was no evidence in the medical records that Plaintiff experienced significant side effects from his medications. Tr. at 19.

The ALJ found that Plaintiff's credibility was not significantly enhanced by his work history, noting that he had previously performed substantial gainful work at the medium level despite his obesity and osteoarthritis. The ALJ stated that Plaintiff did not appear to be in any "obvious credible distress" during the course of the hearing, noting that Plaintiff was able to sit through the one-and-a-half-hour hearing without standing or "any indication of discomfort while he was seated." Tr. at 20.

The ALJ found that Plaintiff retained the RFC to perform work-related activities

with the following exceptions: lifting or carrying more than ten pounds occasionally and less weight frequently; standing or walking more than two hours in an eight-hour workday; sitting more than six hours in an eight-hour workday or continuously without occasionally changing positions to stand briefly; operating right leg controls repetitively; kneeling, crawling, or climbing; very limited stooping or crouching; and exposure to extreme cold. Tr. at 19.

The ALJ found that Plaintiff was not capable of performing his past relevant work and did not have relevant transferable skills. The ALJ found that based on Plaintiff's RFC, he was capable of performing a significant range of sedentary work. The ALJ relied on the vocational expert's testimony that a person with Plaintiff's vocational factors and RFC was capable of working as a cashier, food and beverage order clerk, or telephone solicitor, unskilled, sedentary positions which existed in significant numbers in the St. Louis metropolitan statistical area. The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act. Tr. at 22-23.

As stated above, Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ committed reversible error by (1) not sufficiently addressing the issue of whether or not Plaintiff was disabled because he met Listing 1.02 (major dysfunction of a joint); (2) not considering submitted medical evidence related to Plaintiff's obesity; and (3) making an unfair and inappropriate credibility assessment of Plaintiff's subjective complaints. Plaintiff asks the Court to reverse the Commissioner's decision and order an award of benefits, or alternatively, to reverse the decision and remand the case for further proceedings.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoted case omitted). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision;'" the court must also take into account whatever in the record fairly detracts from that decision. Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). If after reviewing the record the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

In order to qualify for Social Security disability benefits, a person must demonstrate an inability to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not

less than 12 months. 42 U.S.C. § 423(d)(1)(A)[9]; <u>Barnhart v. Walton</u>, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to engage in substantial gainful employment must last or be expected to last not less than 12 months).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, disability benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment (or combination of impairments), defined in 20 C.F.R. § 404.1520(c) as an impairment which significantly limits a claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, the disability claim is denied. If the impairment is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1.

If the claimant's impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If the claimant is able to perform his past relevant work, he is not disabled. If he cannot perform his past relevant work, step five asks whether the claimant has the RFC to perform work in the national economy in view

---

[9] As is the general convention when both disability insurance and SSI benefits are involved, references to relevant regulatory provisions in the ALJ's decisions, the parties' briefs, and this Memorandum and Order are only to those appearing under the SSA's program for disability insurance benefits. The provisions are identical under both programs.

of his impairments and vocational factors.  If not, the claimant is declared disabled and is entitled to disability benefits.  20 C.F.R. §§ 404.1520(a)-(f); <u>Fastner v. Barnhart</u>, 324 F.3d 981, 983-84 (8th Cir. 2003); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  The claimant carries the burden of establishing that he is unable to perform his past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish at step five that the claimant maintains the residual functional capacity to perform a significant number of jobs within the national economy.  <u>Pearsall</u>, 274 F.3d at 1219.  Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's Guidelines (20 C.F.R. Pt. 404, Subpt. P, App. 2) due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony by a vocational expert.  <u>Id.</u>; <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1137 (8th Cir. 1998).  The response of a vocational expert to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five.  <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001).

**<u>ALJ's Failure to Address Listing Requirements</u>**

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful employment since December 8, 2000.  He found at step two that Plaintiff's impairments of degenerative joint disease of the right knee, genu varum, and obesity qualified as severe under the regulations.  The entirety of the ALJ's discussion of step three consisted of the conclusion that these impairments were "not severe enough to meet

16

or medically equal one of the listed impairments."

Plaintiff contends that the ALJ's cursory treatment of the Listing of Impairments is reversible error. He further asserts that his impairment meets or medically equals Listing 1.02 of Appendix 1 for major dysfunction of a joint. Plaintiff points to his visible deformity, the medical records documenting his pain and limitation of motion, the x-rays showing joint space narrowing, Plaintiff's testimony as to his difficulty in walking, and his physicians' restrictions of no prolonged walking.

The Listings for musculoskeletal impairments were revised in 2001, and the new regulations became effective on February 19, 2002. This was after Plaintiff filed his applications, but before his administrative hearing. In publishing the new regulations, the SSA stated that the new rules would be applied to all cases still under review on that date. 66 Fed. Reg. 58,010, 58,011 (Nov. 19, 2001). Thus, we review the ALJ's ruling in accordance with the revised listings. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 967 (8th Cir. 2003) (adhering to the SSA's directive as to which regulations to apply).

The Eighth Circuit has stated that, "[a]lthough it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion." Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003); accord Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999) (stating that a failure of the ALJ to address the applicable listing did not itself necessitate a reversal because "a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case"). This Court must therefore inquire as to whether the ALJ's determination that Plaintiff did not

satisfy Listing 1.02 is supported by substantial evidence.  See Senne, 198 F.3d at 1067.

Listing 1.02 provides in relevant part that a claimant is presumptively and conclusively disabled if his impairments satisfy four requirements:

> [1] gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability), and [2] chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and [3] findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

> A. [4] Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in an inability to ambulate effectively, as defined in 1.00B2b. . . .

The Commissioner has not disputed that Plaintiff's condition satisfies the first three requirements of Listing 1.02, and the Court does not find substantial evidence in the record that would support a finding that those requirements are not met.

Regarding the first requirement, gross anatomical deformity, the ALJ found, and the medical records confirm, that Plaintiff has a genu varum deformity.  The ALJ personally observed "that there was about a 3 to 4 inch lateral bowing of the right knee." Tr. at 19.  Stedman's Medical Dictionary 714 (26th ed. 1995), defines genu varum as "a deformity marked by medial angulation of the leg in relation to the thigh; an outward bowing of the legs."  "Gross" is defined as "large enough to be visible to the naked eye." Id. at 749.  This Court cannot say that the record supports the conclusion that the first requirement of Listing 1.02 is not met.

As to the second requirement, chronic joint pain and stiffness with signs of limitation of motion, Plaintiff's impairment meets these criteria.  Though the ALJ stated

in his opinion that "[s]ignificant clinical signs typically associated with chronic pain have not been consistently present on physical examination," to the extent that this represents a finding by the ALJ that Plaintiff does not suffer from chronic pain, it would not be supported by substantial evidence. Plaintiff's medical records spanning more than a year relate repeated and uncontroverted complaints of knee pain. While the ALJ was not impressed with the strength of Plaintiff's prescribed pain medication, the fact that Plaintiff was repeatedly prescribed various prescription pain medications by different physicians is evidence of his chronic pain. Moreover, the regulations provide that where a symptom is a criterion of a listed impairment, "it is only necessary that the symptom be present in combination with the other criteria. It is not necessary, unless the listing specifically states otherwise, to provide information about the intensity, persistence or limiting effects of the symptom as long as all of the findings required by the specific listing are present." 20 C.F.R. 404.1525(f).

Similarly, though the record discloses no specific finding by the ALJ regarding stiffness and limited motion of Plaintiff's right knee, the medical records show that Plaintiff meets this criterion. Plaintiff's treating physician noted on April 2, 2002, that examination of Plaintiff's right knee revealed a "painful arc of motion from -10 to 105 degrees." Tr. at 152. Further, the consulting physician (Dr. Tippett) found on May 9, 2003, that Plaintiff's range of motion in his right knee was only 90 degrees, compared to a left knee range of motion of 140 degrees, indicating that the right knee limitation was not a result of Plaintiff's obesity, but rather of his physical deformity. Tr. at 181.

Plaintiff likewise satisfies the third requirement, "findings on appropriate

medically acceptable imaging of joint space narrowing." Plaintiff's medical records reveal that an x-ray of Plaintiff's right knee, dated March 16, 2001, showed "medial and lateral joint space narrowing." Tr. at 136.

Though, as noted above, the Commissioner does not dispute that Plaintiff satisfies these first three requirements of Listing 1.02, the Commissioner does argue that Plaintiff has not shown that he meets the fourth requirement, "an inability to ambulate effectively, as defined in 1.00B2b." The Commissioner only quotes the first paragraph of this section in her brief before this Court, neglecting to include the second paragraph. Section 1.00B2b of Appendix 1, in full, provides:

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Appendix 1, § 1.00B2b (emphases added).

The Commissioner focuses exclusively on the first paragraph of this section and contends that, because Plaintiff does not use a hand-held assistive device that limits the functioning of both upper extremities, he necessarily ambulates effectively. Such an argument fails to acknowledge that if Plaintiff, as he testified, is not capable of walking a block at a reasonable pace, then he is not able to ambulate effectively within the meaning of the listing. Similarly, if Plaintiff is not able to climb a few steps at a reasonable pace with the use of a single hand rail, he does not ambulate effectively.

Again, the Court is left without the benefit of reasoning by the ALJ regarding Plaintiff's ability to ambulate effectively. Some guidance does exist in the ALJ's determination of Plaintiff's RFC. The ALJ found that Plaintiff was capable of "standing or walking" two hours in an eight-hour workday. However, as this capacity is expressed in the disjunctive and spread out over eight hours, it sheds little light on the ALJ's assessment of Plaintiff's ability to walk. See Peck v. Barnhart, 105 Fed. App'x 43, 46 (6th Cir. 2004) (holding that the plaintiff met the previous version of Listing 1.02, requiring a showing of a "markedly limit[ed] ability to walk and stand," despite the fact that he had an RFC that enabled him to walk and stand for two hours in an eight-hour workday; case remanded for an award of benefits). Importantly, the ALJ concluded in his RFC assessment that Plaintiff was not able to climb. While this may not in itself establish that Plaintiff could not ambulate effectively (i.e., "climb a few steps at a reasonable pace with the use of a single hand rail"), it highlights the problem posed by

the lack of specific findings by the ALJ at step three of the sequential evaluation process. The ALJ's general finding that Plaintiff's "allegations regarding his limitations are not totally credible" is not sufficient to substitute for a step three analysis.

The medical records are likewise indeterminate as to Plaintiff's ability to ambulate effectively. The consulting physician, Dr. Tippett, found that Plaintiff could stand or walk for two hours over an eight-hour workday and did not require external assistance in walking, but nothing more. Treating physicians, Drs. Serfustini and Rao, restricted Plaintiff to no prolonged walking, standing, or climbing, but their records give no more precise guidance as to Plaintiff's ambulatory abilities. In sum, the Court is unable to say that the record supports the overall conclusion that Plaintiff did not meet Listing 1.02.

This situation warrants a remand for the ALJ to specifically consider the relevant listing, make the necessary findings, apply the listings, and "write an opinion that intelligibly relates the findings to the provisions of [the appropriate listing] as properly interpreted." Senne, 198 F.3d at 1068 (remanding case where the record did not enable the court to determine whether ALJ's summary decision that plaintiff did not meet a listing was supported by substantial evidence); see Blizzard v. Barnhart, 2005 WL 946728, at *16-17 (S.D.N.Y. Apr. 25, 2005) (unpublished) (stating that remand necessary where the ALJ did not discuss the relevant listing or consider plaintiff's claims of inability to ambulate effectively).

## CONCLUSION

The Court remands the case to the ALJ to make the findings necessary to determine whether Plaintiff's impairment meets Listing 1.02 and to articulate the reasons

for his findings and determination.  Because the Court remands based on Plaintiff's argument with respect to step three, it is not necessary to address his step five arguments.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REMANDED**.

An appropriate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 5th day of December, 2005